STATE

v.

William M. O'BRIEN.

STATE

v.

Mary Ann CIULLO.

Nos. 80–113–C.A., 80–114–C.A.

Supreme Court of Rhode Island.

Feb. 12, 1982.

OPINION

MURRAY, Justice.

These are two separate cases that have been consolidated because they present the same legal issue: whether a complaining witness has to appear personally before the Attorney General or one of his designated assistants before a defendant can be charged by information.

In case No. 80–114, the state filed a two-count information charging defendant Mary Ann Ciullo (Ciullo) with one count of assaulting Norma Jean Flemming (Flemming) with a dangerous weapon in violation of G.L.1956 (1969 Reenactment) § 11–5–2 and with a second count of carrying a pistol without a license in violation of G.L.1956 (1969 Reenactment) § 11–47–8. In case No. 80–113, the state filed an information charging defendant William M. O'Brien (O'Brien) with assaulting Edgar W. Logee (Logee) with a dangerous weapon, a metal tape recorder, in violation of G.L.1956 (1969 Reenactment) § 11–5–2.

At a hearing held on January 17, 1980, counsel for each defendant argued that each information should be dismissed for the state's failure to comply with the statutory provisions concerning information charging.[1] The trial justice, relying upon the arguments presented, granted the motions to dismiss. The state has appealed the dismissals. We reverse.

An examination of the information packets and the other portions of the records of the two cases reveals the following facts. In the *Ciullo* case, Police Captain James M. Cook, Jr., of the Narragansett police department, in a criminal-information affidavit signed and sworn to before Special Assistant Attorney General Barry N. Capalbo, averred to the fact that on August 18, 1979, his department received a complaint that a woman had pulled a gun on the attendant at a local laundromat. A description of the suspect and the car in which she left the scene was aired over a police broadcast.

Dennis J. Roberts II, Atty. Gen., Barry N. Capalbo, Sp. Asst. Atty. Gen., for plaintiff.

Paul J. DiMaio, Joni Seplocha, Providence, for defendant Mary Ann Ciullo.

1. The record is unclear regarding the exact manner in which the matters came to be heard in a single proceeding. Also, although Ciullo's counsel did file a motion to dismiss the information, there is no indication from the record that O'Brien's counsel ever filed such a motion.

The vehicle was located a short time later in the parking lot of a restaurant. When the suspect (who turned out to be Ciullo) and her companions returned to the car they were approached by two officers of the department. After identifying themselves, the officers took Ciullo and her companions back to the laundromat, where she was identified as the woman who had threatened the attendant with a gun. The gun was turned over to police by Ciullo's boy friend, with whom she had been staying at a local campground.

In a signed statement given to the police, which statement was included as one of the exhibits attached to the criminal-information affidavit, Flemming described the incident at the laundromat. She stated that she had recognized the two women and the two children as those with whom she had had problems the previous week. The four left the building, taking their laundry with them to a car; they soon returned. At this point, Flemming continued, Ciullo "walked about four feet from me and pointed a small gun right at my face. She said to me, 'Your head is going to get blown off.' " Flemming's statement also indicated that she was able to identify Ciullo when the police brought her back to the laundromat. In addition, Flemming was able to recognize the gun when it was later shown to her by the police.

Three other women who witnessed the incident gave statements to police that corroborated Flemming's statement. In essence, Polly Ann Kuno and Deborah Kuno described Ciullo's personal appearance and the events that had occurred earlier in the day. They both stated that Ciullo had pointed the gun at Flemming's face. The third woman, Kathleen Nigrelli, stated that she had seen Ciullo raise her hand and point it at Flemming. Although Nigrelli admitted that she had not seen the gun, she did state that she "had been watching [Ciullo's] face and her expressions."

The final signed statement, included in the information packet, was given by the investigating officer, Patrolman Glenn Browning. In his statement he described the apprehension of Ciullo and her subsequent identification by Flemming. He also described the recovery of the .25-caliber pistol from Ciullo's residence. He stated that he test-fired the weapon and found it to be operative.

In the *O'Brien* case, the criminal-information packet contains the sworn and signed criminal-information affidavit of Police Captain James M. Cook, Jr., alleging probable cause, as well as the statements of three witnesses to the incident. The information packet reveals that on August 24, 1979, at 12:15 a. m., Logee entered the Narragansett police station bleeding from his left ear. A short time earlier, at the Sweet Meadows Inn, Logee had engaged in some type of "discussion" with O'Brien. Evidently, the conversation quickly became laden with threats and profanity. According to Logee's statement given to Cook at the station, Logee invited O'Brien to accompany him "outside [to] get this matter straighten[ed] out." Logee's stated intention was to talk "this matter out and not to cause any problems inside." O'Brien accepted the invitation; an altercation resulted.

During the brief altercation, Logee struck O'Brien once, whereas O'Brien struck Logee either two or three times. Logee alleged, in his statement, that O'Brien hit him on the left side of his face after O'Brien had shifted some type of "recorder or electronic device" into his right hand, the hand used to strike Logee. At the time of the incident, Logee claimed that O'Brien might have discarded the device perhaps in some heavy bushes not far from the site of the altercation. A search of the area by the police and a security guard working at the Sweet Meadows Inn failed to locate the device.

Logee's description of the incident was generally corroborated by a statement given to police by Alana Lardner. Lardner alleged to being only two or three feet away from the altercation when it took place; she stated that it appeared as if "O'Brien had a beeper or some other small black object in his hand" as he hit Logee. She, unlike Logee, was not sure who had struck the first blow.

In response to a police visit to his home, O'Brien, who was not home at the time of the visit, appeared a short time later at the Narragansett police station. A statement given by Patrolman James J. Voelker, included his report of both Logee's and O'Brien's visits to the station. According to Voelker's statement, O'Brien was informed of the complaint against him and read his rights. O'Brien signed a rights-waiver form and made a statement. O'Brien, in a dictated statement that was later typed, admitted to throwing "three quick shots" but only after Logee had split his lip with "a first shot." In his statement, O'Brien did not mention having an object in his hand at the time he struck Logee.

There is no disagreement among the three witnesses to the incident that the altercation was quickly broken up by some patrons of the bar and that O'Brien was then asked to leave the area. Logee went to South County Hospital and was treated for an injury to his left ear which required stitches. A copy of the hospital report and a copy of a police photograph of Logee's injuries were also included as exhibits in the information packet.

At the hearing on January 17, 1980, Ciullo's counsel argued that the information against his client should be dismissed because of the Attorney General's failure to follow the requisite statutory provisions concerning information charging, requirements he viewed as constitutionally mandated. He admitted that he was not contesting the fact that the exhibits in the information packet were sufficient to establish probable cause; instead he was contesting the fact "that the information was not obtained in accordance with statutory provisions." He emphasized what he viewed as two requirements for proper information charging under our statutes: first, that the victim must personally appear before the Attorney General or his designated assistant and sign an affidavit. And, second, that the Attorney General or his designated assistant determine from the information packet that he finds probable cause.

In applying his analysis to the facts of the case, Ciullo's counsel argued that the charge was being instituted without any contact on the part of the Attorney General's office with the victim.[2] This method, he claims, was impermissible because it did not provide defendants protection similar to that provided under the grand jury system. He argued that Flemming's statement to police was not even an affidavit and that it is the Attorney General's responsibility to present affidavits. He concluded by arguing that it was actually the police who had found probable cause and not the Attorney General; this statement was based upon the fact that the criminal-information affidavit signed by Captain Cook attached a police narrative and exhibits to demonstrate the existence of probable cause.

The state, admitting that there was no affidavit in the information packet that had been signed by the victim in the presence of a member of the Attorney General's office, argued that it was not the victim's decision to determine if a prosecution would take place, but the decision of the Attorney General and the police. He emphasized that the information packet did contain a statement signed by Flemming and witnessed by the police and that it was this statement that eventually led to the charge against Ciullo.

The trial justice, obviously agreeing with the argument raised by Ciullo's counsel, repeatedly asked the state's counsel if the Attorney General had interviewed the victim or if the Attorney General had an affidavit from the victim stating she would like to proceed with the prosecution. The trial justice also asked if the state would indict "on the statement of [a] police officer, not a sworn statement[.]" Evidently the attorney for the state did not answer the questions to the trial justice's satisfaction because the trial justice granted Ciullo's motion to dismiss.

After the grant of Ciullo's motion, O'Brien's counsel stated that he had the

---

**2.** During the hearing, Ciullo's counsel presented a statement signed by Flemming in which

Flemming stated that she wanted to drop all charges against Ciullo.

same objection. He also added that Captain Cook, the officer signing the criminal-information affidavit, was not the investigating officer in the *O'Brien* case. The trial justice granted O'Brien's motion "likewise."

The state's brief essentially analogizes the information-charging process and grand jury indictments, in which hearsay is admissible before the grand jury and can be the basis for an indictment. Ciullo's counsel admits, correctly so, that this is the general rule. *See Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, *reh. denied,* 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956). In fact, Ciullo's counsel does not contest the fact that hearsay is admissible at the information-charging stage. Evidently Ciullo's counsel has become familiar with G.L.1956 (1969 Reenactment) § 12–12–1.9, as enacted by P.L.1974, ch. 118, § 11, which provides that when a motion to dismiss an information is brought, the trial court, after hearing, may make its determination of probable cause "based in whole or in part *upon hearsay evidence* or on evidence which may ultimately be ruled to be inadmissible at the trial." (Emphasis added.)

Ciullo's counsel argues [3] that the Legislature has established certain procedures to ensure that defendants' due-process rights are protected. He contends that the Attorney General's office has failed to adhere to these procedures in the *Ciullo* case and that the Attorney General's office consistently violates the rights of other defendants through the procedures employed. His concerns are that the Attorney General has not obtained a sworn statement from the complaining witness and that police departments, and not the Attorney General's office, are determining if probable cause exists. In his opinion, the current system is subject to abuse from unscrupulous police departments, especially in an assault case such as this in which defense counsel, at a hearing on the motion to dismiss the information, is able to present a statement from the complaining witness in which the witness expresses a desire not to pursue the prosecution.[4]

We cannot agree with Ciullo's counsel that our statutory framework and the constitutional guarantees of due process mandate the procedure he has outlined. We do not find in either source any requirement indicating that a complaining witness must appear and sign an affidavit in the presence of the Attorney General or his designated assistant. Moreover, we cannot logically infer a custom or pattern of misconduct on the part of the Attorney General's office, as Ciullo's counsel suggests, from the fact that Captain Cook, as well as other police officers, has submitted criminal-information affidavits alleging probable cause. We cannot assume solely because Captain Cook has found probable cause that the Attorney General's office has not made its own independent determination of probable cause. In fact, Ciullo's counsel, at the probable-cause hearing, admitted that he was not contesting the fact that the exhibits in the information packet were sufficient to establish probable cause.

We now explain why neither statutory requirements nor constitutional guarantees mandate the obtaining of affidavits from

---

**3.** O'Brien's counsel did not submit a brief or appear at oral argument. He evidently intends to rely on the arguments presented by Ciullo's counsel.

**4.** In an affidavit submitted by Special Assistant Attorney General Capalbo, a designated assistant for purposes of information charging, Capalbo admits to not having interviewed Flemming but states that she "had recently confirmed her willingness to proceed with the charge and testify if necessary." He avers that he decided to proceed with the case relying upon the *complainant's statement to police,* the corroboration of such story by independent witnesses, and the recovery of a pistol matching the description of the pistol used in the alleged assault, as well as his own understanding that he need not personally interview the complainant. In a separate affidavit, Capalbo averred to the fact that he personally interviewed Logee concerning the alleged assault by O'Brien prior to determining if sufficient evidence existed to prosecute. Since the Capalbo affidavits were not before the trial court, we shall not consider them in making our determination.

the complaining witness by the Attorney General's office when prosecution is sought through information charging.

In reference to the statutory framework for information charging, Ciullo cites G.L. 1956 (1969 Reenactment) § 12–12–1.5, as enacted by P.L.1974, ch. 118, § 11, as authority for her position that affidavits sworn to before the Attorney General or his designated assistant are required. Section 12–12–1.5 provides:

> "When an offense is prosecuted by information, the attorney-general shall attach to the information any exhibits, *such as* affidavits sworn to before the attorney-general or one of his designated assistants, documents, photographs, recordings, or other materials or copies thereof, upon which he relies to demonstrate the existence of probable cause to believe that the offense charged in the information has been committed and that the defendant committed it." (Emphasis added.)

We view the "such as" language of the above statute as signifying a legislative intent to illustrate the kinds of exhibits the Attorney General may include in the information packet. The statute does not contain any language that requires any particular exhibit to be attached to the information. Even if we were to accept Ciullo's argument that the information packet must contain an affidavit sworn to before the Attorney General or his designated assistant, we would be compelled to find that the Attorney General's office had complied with a strict reading of the statute—an affidavit sworn to before the Attorney General's designated assistant was submitted by Captain Cook.

In addition, in interpreting the information-charging framework, we are guided by the "Explanation of Chapter 118" printed in the public laws of 1974. In November of 1973, the people of the State of Rhode Island passed a constitutional amendment that allowed all felonies except those punishable by death or life imprisonment to be prosecuted by information. *See* R.I.Const. amend. XL, sec. 1, amending art. I, sec. 7 of the Rhode Island Constitution. In response to the amendment, the Legislature passed P.L.1974, ch. 118, § 11—the statutory framework for information charging. *See* Explanation of ch. 118, P.L.1974, ch. 118 at 694. The drafters of the legislation "believe[d]" that their direction to the Secretary of State, in P.L.1974, ch. 118, § 17, to have the "Explanation of Chapter 118" printed would help preserve the purpose and intent of the legislation. *Id.* at 704.

The explanation reveals that the Legislature intended to implement a plain and simplified procedure for the determination of probable cause. As has been previously mentioned, hearsay and other evidence that would not be admissible at trial can form the basis for a trial justice's determination at the probable-cause hearing. Section 12–12–1.9. Of course, it also follows from the terms of § 12–12–1.9 that hearsay may be used to form the information packet. In regard to the duty created by § 12–12–1.5 and placed upon the Attorney General or his designated assistant to attach to the information those exhibits relied upon to demonstrate probable cause, the explanation specifically provides as follows: "The exhibits can be comprised of documents, photographs, recordings, affidavits sworn to before [the Attorney General] or one of his designated assistants, or any other relevant materials that bear on the issue." Explanation of ch. 118, P.L.1974, ch. 118 at 699. The explanation, like the statutory authority, does not reveal a legislative intent to require that a specific type of exhibit be attached to the information.

In *Massey v. Mullen,* 117 R.I. 272, 366 A.2d 1144 (1976), we had occasion to utilize the legislative explanation of the information-charging statutory framework. In *Massey,* the state, in responding to a habeas corpus petition, attempted to analogize the procedures required in a bail hearing to those required in a probable-cause determination. *Id.* at 279, 366 A.2d at 1148. In rejecting the state's argument, we concluded that a bail hearing required more than the "minimal, preliminary showing" of a probable-cause hearing. *Id.* at 280, 366

A.2d at 1148. We found that the official explanation indicated a legislative intention concerning the probable cause hearing to provide "only a preliminary screening device [that] require[s] only a minimal showing by the state." *Id.* Relying on part of the "Explanation," we quoted as follows:

" 'In essence, the state is entitled to the benefit of every reasonable inference in [the probable cause] proceeding, which is intended only as a preliminary screening device and not to resolve ultimate questions of guilt or innocence. For that reason, the usual rules of evidence are not applicable at this stage of the proceeding and the state is entitled to rely on hearsay evidence as well as evidence which ultimately may prove not to be admissible at the trial, even if it is claimed such evidence was acquired by unlawful means.' Explanation of ch. 118, P.L.1974, ch. 118 at 702." *Id.*

In her brief, Ciullo cited the case *Pugh v. Rainwater*, 483 F.2d 778 (5th Cir.), *cert. granted sub nom., Gerstein v. Pugh*, 414 U.S. 1062, 94 S.Ct. 567, 38 L.Ed.2d 467 (1973), when discussing the constitutional foundation for the information-charging procedures. Counsel for Ciullo, at oral argument, admitted that the authority cited has been modified by the United States Supreme Court. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In *Gerstein*, the Supreme Court held that the Fourth Amendment requires that a neutral and detached magistrate make a probable-cause determination before a defendant can be subjected to an extended restraint of liberty following arrest. *Id.* 420 U.S. at 114, 95 S.Ct. at 863, 43 L.Ed.2d at 65. The prosecutor's decision to prosecute in itself would not be sufficient to justify such restraint. *Id.* 420 U.S. at 117, 95 S.Ct. at 864, 43 L.Ed.2d at 67. The Fourth Amendment does not require that the determination of probable cause be accompanied by such adversarial safeguards as the right to counsel, the right of confrontation, the right of cross-examination, and the right to compulsory process for witnesses. *Id.* 420 U.S. at 119–20, 95 S.Ct. at 866, 43 L.Ed.2d at 68–69. The Supreme Court specifically stated:

"These adversary safeguards are not essential for the probable cause determination required by the Fourth Amendment. The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings. This issue can be determined reliably without an adversary hearing. The standard is the same as that for arrest. That standard—probable cause to believe the suspect has committed a crime—traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." (Footnote omitted.) *Id.* 420 U.S. at 120, 95 S.Ct. at 866, 43 L.Ed.2d at 69.

At this point we determine (1) that the Rhode Island statutory procedure is consistent with the constitutional requirements set forth in *Gerstein*, (2) that there is no requirement either in the statutory law or in the constitutional guarantees of due process that the Attorney General or his designated assistant must obtain an affidavit from the complaining witness, and (3) that we cannot find that the Attorney General's office relied solely upon the probable-cause determination of the police, especially in light of the fact that the exhibits attached to the information admittedly were sufficient to establish probable cause. We therefore conclude that it was improper for the trial justice to have dismissed the informations.

The state's appeals are sustained, the judgments appealed from are vacated, and the cases are remanded to the Superior Court for further proceedings consistent with this opinion.